NOT FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

11-0770

STATE OF LOUISIANA
IN THE INTEREST OF
D.P., M.P., & Z.P.

* * * * * * * *

FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. JC-2009-1007
HONORABLE MARILYN CASTLE, DISTRICT JUDGE

* * * * * * * *

JIMMIE C. PETERS
JUDGE

* * * * * * * *

Court composed of John D. Saunders, Jimmie C. Peters, and Marc T. Amy, Judges.

**AFFIRMED.**

Saunders, J., dissents and assigns written reasons.

William T. Babin
405 West Convent Street
Lafayette, LA 70501
(337) 232-7747
COUNSEL FOR APPELLEE:
    Louisiana Department of Social Services

Annette Roach
Fifteenth Judicial District Public Defenders Office
P. O. Box 3622
Lake Charles, LA 70502
(337) 436-2900
COUNSEL FOR DEFENDANT/APPELLANT:
    Mother/M.P.

**Allyson M. Prejean**
**Attorney at Law**
**P. O. Box 3862**
**Lafayette, LA 70502**
**(337) 291-9444**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Father/L.P.**

**Lloyd Dangerfield**
**Attorney at Law**
**703 East University Avenue**
**Lafayette, LA 70503**
**(337) 232-7041**
**COUNSEL FOR APPELLANTS:**
     **Children/L.P., M.P., & Z.P.**

**PETERS, J.**

The mother, the father, and the three minor children of the marriage appeal the judgment terminating the mother's and father's parental rights to D.P. (a boy born November 17, 2006), M.P. (a girl born October 10, 2007), and Z.P. (a girl born January 2, 2009) and certifying the children as eligible for adoption.[1] For the following reasons, we affirm the trial court judgment in all respects.[2]

## DISCUSSION OF THE RECORD

The three children at issue in this litigation were born to the marriage of M.P.(M)[3] and L.P. on the dates set forth above. The State of Louisiana through the Department of Children and Family Services (hereinafter sometimes referred to as the "state" or "DCFS") became involved with this family in July of 2007, or less than one year after the birth of D.P. At that time, D.P., who had been born prematurely,[4] was determined to be suffering from a "failure to thrive" to the extent that was expected of a child of his age. Initially, DCFS attempted to work with the parents by providing in-home services to make sure the parents obtained basic medical attention for D.P. By the time of Z.P.'s birth in January of 2009, M.P., who was also born prematurely,[5] was also determined to be suffering from a failure to thrive. Again DCFS approached the problem by offering in-home services. Matters did not improve and, on September 18, 2009, DCFS recognized that D.P. continued not to progress as would have been expected of a child of his age. Despite being almost three years of age, D.P. weighed only twenty pounds.

---

[1] We use the initials of the children and their parents to protect the identity of the minor children. Uniform Rules—Courts of Appeal, Rules 5-1, 5-2.

[2] The children adopt the arguments that their mother and father set forth on appeal. Accordingly, we will not address their assignments of error individually.

[3] We will identify the mother as M.P.(M) to differentiate her from the child M.P.

[4] D.P. was born twenty-six weeks into the pregnancy.

[5] M.P. was born twenty-four weeks into the pregnancy.

DCFS removed the children from their parents' home on September 22, 2009, and they were placed in the custody of the state. On December 8, 2009, the trial court adjudicated the children as children in need of care. The pleading giving rise to this litigation occurred on February 22, 2011, when DCFS filed a petition to terminate the parents' parental rights pursuant to the authority of La.Ch.Code art. 1015(5).

In its petition DCFS based its request for relief on the assertion that the parents had not complied with the case plans presented to them, and that there was no reasonable expectation of significant improvement in the near future. At the April 21, 2011 trial, the state called two witnesses and the parents called three. This testimony, combined with a number of exhibits,[6] constituted the record upon which the trial court based its decision.

The testimony of Megal Callais, the family's DCFS caseworker, established that while the mother and father did extremely well when DCFS provided in-home services, as soon as those services ceased the parents failed to follow through with assuring medical attention for their children. With regards to compliance with the case plans promulgated after the children came in to the custody of the state, Ms. Callais suggested that their performance was woefully inadequate.

One of the goals set forth in the case plan was for the parents to maintain a stable and steady home situation. Despite this mandate, the parents were evicted from their home in July of 2010 and resided with M.P.(M)'s mother for two months thereafter. For the next six months, they resided with L.P.'s aunt. They then obtained their own home for approximately one year before moving into another home on March 31, 2011, or just weeks before trial. This constant moving

---

[6]L.P. offered applications he had made for Medicaid and Social Security benefits, and M.P.(M) offered check stubs as evidence of her current employment and an excuse from The Family Tree, a Lafayette, Louisiana information, education, and counseling center.

complicated communication with DCFS, and of the twenty-six home visits attempted by Ms. Callais, the parents were only found at home on eight occasions.

An important condition of the case plan was naturally the requirement that the parents maintain adequate food for the children, given their developmental conditions. Despite this very special condition directed at the children's wellbeing, Ms. Calais' successful home visits revealed little or no food on the premises.

According to Ms. Callais, M.P.(M) failed to meet almost all of the individual case plan goals assigned to her. Although she was to maintain steady employment, she remained unemployed until approximately three weeks before trial, when she began working at a Checkers Restaurant.

The case plan also called for M.P.(M) to participate in drug rehabilitation programs. Not only did she not attend the educational and group therapy programs set up for her, but on May 12, 2010, she tested positive for opiates. When she was referred for intensive inpatient treatment after this discovery, she refused the services. Furthermore, on June 14, 2010, she refused to take a drug screening test. In January of 2011, M.P.(M) appeared to have a change of heart and attempted to readmit herself to the education and group therapy program previously offered. DCFS recommended that she receive outpatient services because she was ineligible for inpatient treatment due to an unrelated medical condition. A reference to the Tyler Mental Health facility proved unproductive and the facility closed her case file because of noncompliance. A reference to Family Tree resulted in little more than an attempt by M.P.(M) to make an appointment shortly before trial.

The only goal of the case management plan that was completed by M.P.(M) was parenting classes. However, according to Ms. Callais, even though she completed the class requirements, the class provider questioned M.P.(M)'s ability

3

to perform as an adequate parent, and noted that M.P.(M) was below average with regard to the skills required to meet a child's needs.

L.P. fared no better in Ms. Callais's analysis. According to Ms. Callais, L.P. complied only minimally with his individual case plan. Not only did he fail to obtain mental health treatment, he only applied for Social Security and Medicare benefits shortly before trial. Additionally, the parenting class provider had concerns similar to those expressed about M.P.(M) with regard to his ability to meet a child's needs.

Dr. Edmond Bergeron, a Lafayette, Louisiana clinical psychologist, examined both M.P.(M) and L.P. in October of 2009 and concluded that, at that time, neither parent could safely care for the children. He found that M.P.(M) suffered from such anxiety that sometimes she was too overwhelmed to even cook a meal. Although she had completed the eleventh grade of high school and was a certified nursing assistant, Dr. Bergeron found that her IQ score was 77. Although he did not believe that her intellectual functioning alone would preclude her from being a primary caregiver for the children, that finding, together with her passive parenting style and anxiety condition, did. He suggested that M.P.(M) probably suffered from a mild bipolar disorder and needed parenting skills training and stability in her life before she would be able to be a satisfactory parent.

L.P.'s IQ was determined to be 67, which, according to Dr. Bergeron, placed him in the upper limits of the mild mental retardation range. Although asserting that his wife was a good mother, L.P. admitted to Dr. Bergeron that she did not consistently cook for the family, and he acknowledged that he needed to learn to cook and provide for his children in those situation when his wife could not. Dr. Bergeron concluded that L.P. was in a state of denial, and that fact combined with his mental limitations precluded him from being a satisfactory caregiver to his

4

children. In fact, Dr. Bergeron opined that there was nothing L.P. could do to improve his situation

Dr. Bergeron's opinion, based on his 2009 interviews, was that the parents would need someone in the home twenty-four hours per day if the children were returned to them. Still, he stated that there was no question but that the parents loved their children and wanted to take care of them. The problem was that neither was qualified to be a primary caregiver to the children. Despite the fact that his initial opinions were over eighteen months old at the time of trial, he heard nothing at trial that would change his opinion. Dr. Bergeron said that the continuous lack of food in the home was a symptom of the parents' inability to move forward.

The three witnesses who testified for L.P. did not contradict the evidence provided by DCFS. P.A.F., L.P.'s mother, testified that she was willing to live with the family and help care for the children. However, she works as a breakfast cook from 4:30 a.m. until 11:30 a.m. and cleans houses between 3:00 p.m. and 5:00 p.m. six days a week. Additionally, she had only seen her grandchildren once during the eighteen months that they were in the state's custody. A.W., M.P.(M)'s sister, also suggested that she would be willing to assist the parents on a regular basis during the day. She is thirty-eight years old and has four daughters ranging in age from sixteen to nineteen who would be willing to help with the children. She also saw the children only once during the eighteen months of DCFS's custody. Finally, T.J., M.P.(M)'s Narcotics Anonymous sponsor, testified that she had known the parents for one year, and that although she had never met the children, she would be willing to help take care of the children in either her home or the parents' home. T.J., who works from 9:00 a.m. until 3:00 p.m., is in a program to become a licensed practical nurse.

At the close of the hearing, the trial court rendered judgment terminating the parents' rights and certifying the children for adoption. The parents and the children have appealed.

The father asserted two assignments of error:

1    The trial judge's termination of L.P.'s parental rights and the certification of his children for adoption was an abuse of discretion, manifestly erroneous and/or clearly wrong. Particularly, the trial court erred in finding that DCFS had proven by clear and convincing evidence that L.P. failed to substantially comply with his case plan, and that there was no reasonable expectation of significant improvement in his condition or conduct in the near future.

2.    The trial judge's finding that termination of L.P.'s parental rights was in the best interest of his children was an abuse of discretion, manifestly erroneous and/or clearly wrong.

The mother asserted two assignments of error:

1.    The trial court erred in terminating the parental rights of M.P. The court further erred in concluding that M.P.'s lack of focus was sufficient to prove by clear and convincing evidence that M.P. had not substantially complied with her case plan and that there was no reasonable expectation for further improvement in her condition or conduct in the near future nor reasonable expectation that she would complete any new requirements of the case plan as deemed necessary for the safe return of the children.

2.    The trial court erred in finding that termination was in the best interest of the children, especially considering the relationship the children have with M.P.

In their appeal, the children adopted the assignments and arguments of their parents.

**OPINION**

The procedure for termination of parental rights is found in Title X of the Louisiana Children's Code. Louisiana Children's Code Article 1001 provides that the purpose of termination proceedings "is to protect children whose parents are unwilling or unable to provide safety and care adequate to meet their physical, emotional, and mental health needs, by providing a judicial process for the

6

termination of all parental rights and responsibilities and for the certification of the child for adoption."

In *State in the Interest of J.A.*, 99-2905, pp. 7-9 (La. 1/12/00), 752 So.2d 806, 810-11, the supreme court summarized the general rules governing suits seeking the termination of parental rights as follows:

> In any case to involuntarily terminate parental rights, there are two private interests involved: those of the parents and those of the child. The parents have a natural, fundamental liberty interest to the continuing companionship, care, custody and management of their children warranting great deference and vigilant protection under the law, *Lassiter v. Department of Soc. Servs.*, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981), and due process requires that a fundamentally fair procedure be followed when the state seeks to terminate the parent-child legal relationship, *State in Interest of Delcuze*, 407 So.2d 707 (La.1981). However, the child has a profound interest, often at odds with those of his parents, in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, and continuous relationships found in a home with proper parental care. *Lehman v. Lycoming County Children's Serv.'s Agency*, 458 U.S. 502, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982); *see also State in the Interest of S.M.*, 98-0922 (La.10/20/98), 719 So.2d 445, 452. In balancing these interests, the courts of this state have consistently found the interest of the child to be paramount over that of the parent. *See, e.g., State in the Interest of S.M.*, 719 So.2d at 452; *State in the Interest of A.E.*, 448 So.2d 183, 186 (La.App. 4 Cir.1984); *State in the Interest of Driscoll*, 410 So.2d 255, 258 (La.App. 4 Cir.1982).

> * * *

> Title X of the Children's Code governs the involuntary termination of parental rights. LA. CHILD. CODE art. 1015 provides the statutory grounds by which a court may involuntarily terminate the rights and privilege of parents. The State need establish only one ground, LA. CHILD. CODE art. 1015, but the judge must also find that the termination is in the best interest of the child. LA. CHILD. CODE art. 1039. *See State in Interest of ML & PL*, 95-0045 (La.9/5/95), 660 So.2d 830, 832. Additionally, the State must prove the elements of one of the enumerated grounds by clear and convincing evidence to sever the parental bond. LA. CHILD. CODE art. 1035(A); *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (holding that the minimum standard of proof in termination of parental rights cases is clear and convincing evidence).

7

DCFS based its petition for termination of both parents' parental rights on La.Ch.Code art. 1015(5), which states the conditions for asserting such a drastic remedy:

> Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

Lack of substantial compliance with a case plan as set out in La.Child.Code art. 1015(5) may be proven by establishing one or more of these factors:

> (1)  The parent's failure to attend court-approved scheduled visitations with the child.
>
> (2)  The parent's failure to communicate with the child.
>
> (3)  The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.
>
> (4)  The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.
>
> (5)  The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
>
> (6)  The parent's lack of substantial improvement in redressing the problems preventing reunification.
>
> (7)  The persistence of conditions that led to removal or similar potentially harmful conditions.

La.Ch.Code art. 1036(C).

The lack of any reasonable expectation of significant improvement in the parents' conduct in the near future may be established by proving by clear and convincing evidence one of the following:

(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.

(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.

(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.

La.Ch.Code art. 1036(D).

This court must apply the manifest error standard when reviewing the trial court's findings as to whether parental rights should be terminated. *State ex rel. K.G.*, 02-2886, 02-2892 (La. 3/18/03), 841 So.2d 759. Whether a parent has complied with a case plan, the expected success of rehabilitation, and the expectation of significant improvement in the parent's condition or conduct are all questions of fact that may not be set aside in the absence of manifest error or unless they are clearly wrong. *State in the Interest of T.L.B.*, 00-1451 (La.App. 3 Cir. 4/4/01), 783 So.2d 626.

In its petition to terminate the parental rights of M.P.(M) and L.P., DCFS asserted that the parents had failed to comply with the case plan and that there was no reasonable expectation of significant improvement in either parents' condition or conduct, with the following allegations:

a.     The [parents have] failed to obtain a stable and safe home, and steady employment or income, in order for the children to be returned to [their] custody;

b.     The [parents have] failed to meet with the case manager or attend the family team conferences as required by the case plan;

c.     The [parents have] repeatedly failed to comply with the required program of substance abuse treatment and rehabilitation services;

9

d.    The [parents'] mental illness, mental deficiency, substance abuse and/or chemical dependency renders [them] unable or incapable of exercising parental responsibilities without exposing the children to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior;

e.    The [parents have] failed to pay court ordered child support for the minor children;

f.    The conditions that led to the removal or similar potentially harmful conditions continue to persist;

g.    As set forth above, and as also to be shown at the trial hereof, the [parents have] failed to cooperate in completion of the case plan designed for reunification of the family; and

h.    The [parents have] shown a lack of substantial improvement in redressing the problems which prevent reunification.

Here we cannot say that the trial court was clearly wrong in concluding that the state established the required elements by clear and convincing evidence: that both M.P.(M) and L.P. showed "no substantial improvement in redressing the problems preventing reunification" in that they failed to maintain a stable home and have appropriate food in the house.  Additionally, we find no manifest error in the trial court's conclusion that the conditions which led to the children's removal were still present at the time of the trial some eighteen months after removal, e.g. the mother's passive parenting style, her anxiety, and the father's denial about how his children were being treated.

Having found no manifest error in the trial court's determination that one or more grounds for termination existed at the time of trial, we must also address the issue concerning the best interests of the children.  In making that determination, we continue to be guided by the supreme court's decision in *State in the Interest of J.A.*:

The State's *parens patriae* power allows intervention in the parent-child relationship only under serious circumstances, such as where the State seeks the permanent severance of that relationship in

an involuntary termination proceeding. The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. LA. CHILD. CODE art. 1001. As such, the primary concern of the courts and the State remains to secure the best interest for the child, including termination of parental rights if justifiable grounds exist and are proven. Nonetheless, courts must proceed with care and caution as the permanent termination of the legal relationship existing between natural parents and the child is one of the most drastic actions the State can take against its citizens. The potential loss to the parent is grievous, perhaps more so than the loss of personal freedom caused by incarceration. *State in the Interest of A.E.*, 448 So.2d [183] at 185.

*State in the Interest of J.A.*, 752 So.2d at 811.

Balancing the parents' rights against those of their children's safety and health, we find that the trial court did not commit manifest error in concluding that the best interests of the children requires the termination of their parents' parental rights.

## DISPOSITION

For the foregoing reasons, we affirm the trial court judgment in all respects. We assess all costs of these proceedings to the father, L.P., and the mother, M.P.(M).

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2-16.3.

11

**STATE IN THE INTEREST OF D.P., M.P., & Z.P.**

**SAUNDERS, Judge, dissenting**

The parents in this case have mental limitations which make it impossible for them, alone, to properly care for their children. Dr. Bergeron's conclusion was that both parents could be secondary caregivers, but not primary caregivers. The solution to this problem, he suggests, would be to have another adult in the home in order to meet the needs of the children and to respond to and handle any crisis that arose. In response to this suggested solution, M.P. and L.P. presented the testimony of multiple family members and a friend who are willing to help manage a suitable arrangement for the children.

First, L.P.'s mother has been planning to have the family move in with her for two years. She is currently on a list awaiting a home, which would enable her to house the family. Second, M.P.'s sister testified that she is capable and willing to make daily visits to the home to care for the children when the grandmother would be at work. Eighteen months ago, when the Agency first approached her, she had her hands full with four daughters and three grandchildren living in her home. Today, she has only two daughters, ages sixteen and seventeen, who themselves have agreed to help care for the children. Third, a friend of the family and M.P.'s Narcotics Anonymous sponsor for one year, also agreed to help, even offering to have the family move into her five-bedroom home with her and her own child. She is in training for her LPN, but testified that it is not necessary that

1

she work, since she receives alimony support, and is willing to do what is necessary for the family to be reunited.

I do not feel that termination is appropriate at this point. Termination, under the law, is a last resort. "[C]ourts must proceed with care and caution as the permanent termination of the legal relationship existing between natural parents and the child is one of the most drastic actions the State can take against its citizens. The potential loss to the parent is grievous, perhaps more so than the loss of personal freedom caused by incarceration. *State ex rel. J.A.*, 99-2905 (La. 1/12/00), 752 So. 2d 806, 81 (citing *State in the Interest of A.E.,* 448 So.2d at 185).

It is also my opinion that the case plan established for M.P. was not realistic, dooming her to fail from the start. Dr. Bergeron noted that M.P. displayed potential bi-polar disorder. That, coupled with her anxiety and stress problems, render M.P. unable to perform, on her own, everyday tasks which may seem effortless to others.

Viable, untried options remain. In my view, a new, more realistic plan should be implemented, the key component being the presence of a third, responsible adult in the home to help care for the children.

I also take notice that M.P. has a history of narcotics addiction, which makes the case against her stronger than the one against L.P., who does not have a substance abuse problem. It should also be noted, however, that the last drug screen which M.P. underwent was in May 2010. According to her NA sponsor, M.P. has been drug-free for approximately a year.

Finally, "[w]e note that a finding of mental illness, standing alone, is insufficient grounds to warrant termination of L.A.'s parental rights." *State ex rel. J.A.*, 99-2905 (La.1/12/00), 752 So. 2d 806, 814; *see* La. Child. Code art. 1015, *see also State in the Interest of August v. Fontenot*, 554 So.2d 244 (La.App. 3 Cir.1989).

Termination of parental rights, under law, is and should be, a last resort. In this case, viable, reliable alternatives remain available and untried. I would reverse and remand for a revised reunification plan. Accordingly, I respectfully dissent.